IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-3504-CNS-TPO

ESTATE OF JUSTIN ALTMAN, James Altman, individually and as personal representative of the Estate of Justin Altman, Joy Altman,

Plaintiffs,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTHERN COLORADO; Danica Brown, Jala Randolph, and John Trammell,

Defendants.

---

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND JURY DEMAND UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**[1]

---

[1] Undersigned counsel certifies this motion is opposed.

Defendants, Board of Trustees of the University of Northern Colorado ("UNC"), Danica Brown, Jala Randolph, and John Trammell, move to dismiss the *First Amended Complaint and Jury Demand*, ECF 34, ("FAC") under Rule 12(b)(1) and 12(b)(6).

**INTRODUCTION**

This lawsuit arises from the tragic death by suicide of UNC student, Justin Altman,[2] on May 3, 2024, in his campus dorm room. ECF 34, 2-3; ¶¶ 7, 19, 127-39. Plaintiffs are Justin's father, James Altman, on behalf of himself and as the representative of Justin's estate, along with his mother, Joy Altman. *Id.*, ¶¶ 3-6. Mr. and Mrs. Altman allege that a pattern of concerning behaviors by Justin leading up to his death, including an alleged mental health episode in February 2024, declining academic performance, and poor class attendance, placed UNC officials on notice of Justin's alleged disability arising out of his mental health struggles. *Id.*, ¶¶ 38-63.

Plaintiffs bring six claims. Against the individual Defendants, they allege (1) wrongful death; (2) a survival claim to recover "medical and funeral expenses, and other economic damages;" and (3) a claim for "willful and wanton negligence." *Id.*, ¶¶ 205-49. Next, Plaintiffs bring three disability discrimination claims against UNC under Section 504 of the Rehabilitation Act ("Rehab Act"), 29 U.S.C. § 794(a); the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132; and the Colorado Anti-Discrimination Act (CADA), Col. Rev. Stat. § § 24-34-801(1)(a) and -801(1)(d). *Id.*, ¶¶ 250-374.

[2] To avoid confusion between the father, James Altman, and the deceased, Justin Altman, and meaning no disrespect, this motion refers to Justin by his first name.

As outlined below, the Court should dismiss each claim. Plaintiffs' disability discrimination claims should be dismissed because they do not plausibly allege that UNC knew Justin had a disability or needed accommodation, nor do Plaintiffs plausibly allege that Justin's disability and need for accommodation were open and obvious, such that UNC should have known. Plaintiffs also fail to plausibly allege that their proposed accommodation was reasonable or that Justin was excluded from any UNC program or services because of his disability. Additionally, the CADA claim is barred by Eleventh Amendment sovereign immunity.[3] Plaintiffs' state-law claims fail because the Colorado Governmental Immunity Act (CGIA), Colo. Rev. Stat. §§ 24-10-101 et seq., does not waive immunity for these claims. Finally, the individual Defendants did not owe Plaintiffs a duty of care under the circumstances of this case.

## FACTUAL BACKGROUND[4]

Mr. and Mrs. Altman arrived at UNC on May 3, 2024, to help Justin move out of his room in South Residence Hall for the summer. *Id.*, ¶¶ 20-21, 82-87. Justin, a twenty-three-year-old junior at UNC, was found dead by hanging after his parents requested Residential Coordinators Brown and Randolph, and Officer Trammell, to allow them access to his room. *Id.*, ¶¶ 19, 88-129. Plaintiffs sought to enter Justin's room after he failed to respond to their texts, phone calls, and knocks on his door, as well as their

---

[3] Defendants request that, if this Court dismisses the federal claims brought under the ADA and the Rehabilitation Act, it should also decline supplemental jurisdiction over the remaining state-law claims. *See* 28 U.S.C. § 1367(c).

[4] For purposes of this motion to dismiss, the factual allegations in the FAC are accepted as true. Additional factual allegations will be referenced as needed in the argument.

personal knowledge of his mental health history and his worsening condition throughout the semester. *Id.*, ¶¶ 25-33, 86-93. They urged dorm officials and law enforcement to act quickly because they feared Justin could be experiencing a mental health crisis and that his life may be in danger. *Id.*, ¶¶ 93-95, 105-06, 117, 120-21. Staff declined to unlock the door without Justin's permission, and when Officer Trammell opened the door at some point after he arrived on scene, he was slow to enter the room because he lacked a warrant to proceed and denied exigent circumstances. *Id.*, ¶¶ 94-121.

Officer Trammell eventually entered the room and found Justin hanging in the bathroom. *Id.*, ¶¶ 122-27. He called EMS, cut the rope, and began CPR and chest compressions. *Id.*, ¶¶ 131-32. Paramedics arrived and concluded that Justin died within two hours of the discovery of his body. *Id.*, ¶¶ 134-40.

Plaintiffs allege that Justin had a history of panic attacks, anxiety, and self-harm, and, over the course of the 2023-24 school year, his academic performance had declined. *Id.*, ¶¶ 8, 25-28. They allege that Justin's academic advisor had knowledge of Justin's mental health issues "consistent with anxiety and depression" but UNC officials failed to act. *Id.*, ¶¶ 64-67. They also allege that UNC never informed them Justin's grades were in freefall or that he was missing classes and UNC never provided appropriate counseling or support for Justin. *Id.*, ¶¶ 70, 81, 150, 160, 179, 282, 290, 309, 335, 343, 363, 370. Finally, Plaintiffs allege that UNC should have been aware of a "Student of Concern" report made about Justin within the last year, and, that Justin had been avoiding contact with a Residential Advisor. *Id.*, ¶¶ 142-43, 155, 180. According to Plaintiffs, knowledge of these changes in Justin's behavior is "imputed" to UNC, whose

officials should have understood that Justin had a disability requiring an accommodation, like frequent check-ins. *Id.*, ¶¶ 68-70, 151-59.

## LEGAL STANDARDS

**Fed. R. Civ. P. 12(b)(1):** A Rule 12(b)(1) motion to dismiss challenges a court's subject matter jurisdiction. Sovereign immunity, whether under the Eleventh Amendment or the CGIA, is appropriately raised under Rule 12(b)(1). *Muscogee (Creek) Nation v. Pruitt,* 669 F.3d 1159, 1166–67 (10th Cir. 2012); *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1222 (10th Cir. 2019). In both cases, the party asserting jurisdiction bears the burden of proof. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *City & Cty. of Denver v. Dennis*, 418 P.3d 489, 494 (Colo. 2018).

This Court resolves the CGIA question at the outset. *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 923–24 (Colo. 1993). Where a plaintiff has not alleged sufficient facts to show jurisdiction, or there is no evidentiary dispute of the facts relevant to governmental immunity, this Court may rule on the pleadings alone. *Finnie v. Jefferson Cty. Sch. Dist. R-1*, 79 P.3d 1253, 1260 (Colo. 2003).

**Fed. R. Civ. P. 12(b)(6):** Defendants also move to dismiss the FAC under 12(b)(6) because their allegations, even if true, do not state plausible claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (to survive motion to dismiss, claim must be "plausible on its face."). "A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." *Khalik v. United Airlines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citation altered). Courts must accept all factual allegations as true but need not accept conclusory allegations. *Ashcroft v. Iqbal*,

556 U.S. 662, 663 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ARGUMENT

### I. Plaintiffs do not plausibly allege that UNC discriminated against Justin by failing to accommodate his disability.

The Court should dismiss Plaintiffs' Rehab Act, ADA, and CADA claims because Plaintiffs fail to plausibly allege essential elements of disability discrimination.[5] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, a plaintiff must demonstrate that they (1) are a qualified individual with a disability, (2) who was excluded from or denied the benefits of a public entity's program or otherwise discriminated against (3) by reason of their disability. *See* 42 U.S.C. § 12132; *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007) (citation altered). A plaintiff may satisfy the second element by alleging one of three theories: (1) intentional discrimination, (2) discrimination by disparate impact, or (3) failure to make reasonable accommodation. *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d

---

[5] The ADA and Rehab Act should be analyzed together. "Analysis of a claim under Title II of the ADA is identical to an analysis under the Rehab[] Act." *Kimble v. Douglas Cty. Sch. Dist. RE-1*, 925 F.Supp.2d 1176, 1182 (D. Colo. 2013). CADA claims should be analyzed under the same standard as the ADA claim. Col. Rev. Stat. § 24-34-602(4).

1289, 1295 (10th Cir. 2016). Here, Plaintiffs allege that UNC failed to make reasonable accommodation for Justin's disability.[6]

**A. Justin's disability and need for accommodation were not obvious.**

To prevail on a failure to accommodate claim, Plaintiffs must show that Justin "requested a plausibly reasonable accommodation" and UNC "refused to accommodate [his] disability." *Norwood v. United Parcel Serv., Inc.,* 57 F.4th 779, 786 (10th Cir. 2023). A public entity like UNC cannot be required to provide accommodation unless it is aware of an individual's disability and need for accommodation. *Robertson*, 500 F.3d at 1196–98. And a public entity cannot know that accommodation is necessary "if it does not first understand that an individual requires such [accommodation] *because* he is disabled." *Id.* at 1196 (emphasis original). Thus, an individual seeking accommodation from a public entity must inform the entity of his disability; otherwise, his disability must be obvious. *Id*. Once the entity has knowledge of an individual's disability, it "must also have knowledge that an individual requires an accommodation . . . to participate in or receive the benefits of its services." *Id.* at 1197. Such knowledge may come from an individual's request for accommodation or sometimes the need may be obvious. *Id*.

---

[6] Plaintiffs also assert intentional discrimination under an intentional or deliberate indifference standard. *See, e.g.,* ECF 34, ¶¶ IV.i, 259, 286-95, 301, 339-47, 352, 367-74. Like their failure to accommodate claim, the allegations for this element are lacking. Reference to the intentional discrimination standard is presumably included because Plaintiffs must prove intentional discrimination to recover compensatory damages. *See id.*, ¶¶ 286, 339, 367. For the same reasons as their failure to accommodate claim, Plaintiffs' intentional discrimination claim should also be dismissed.

Plaintiffs do not allege that Justin informed UNC of his disability or need for accommodation. Instead, they allege Justin's disability and need for accommodation were "open, obvious, and apparent." *See, e.g.*, ECF 34, ¶¶ 54, 69, 157, 280, 333, 361. Plaintiffs assert that UNC should have provided "frequent check-ins" on Justin's well-being and his need for this accommodation was obvious. *Id.*, ¶¶ 53, 68-69, 158, 281, 334. According to Plaintiffs, UNC "knew" that Justin's mother requested a wellness check on February 1, 2024; that Justin stopped attending classes between February and May 2024; that he was not responding to professors; and that his grades declined. *Id.* at ¶¶ 147-62. But Plaintiffs fail to demonstrate that UNC, as an entity, was made aware of this information. Even taken together, none of these disparate data points were sufficient to put UNC on notice of Justin's disability or need for accommodation.

The wellness check on February 1, 2024, was prompted by a call from Ms. Altman. *Id.* at ¶¶ 38-39. She told a staff member working the front desk of Justin's dorm that she was concerned because she "had not heard from Justin" and he had not "moved from his dorm" in over a day. *Id.* at 40. She did not tell dorm staff, or anyone else at UNC, about Justin's mental health history, nor did she express concerns about his current mental health status. Dorm staff conducted a wellness check and contacted Justin in his room; according to staff, "Justin looked as though he might have been sleeping." *Id.* at ¶¶ 42-43. The next day, Ms. Altman drove to UNC and took Justin

home for the weekend after observing his mental health. *Id.* at ¶¶ 48, 49. Again, however, she did not inform UNC of her concerns about Justin.[7]

Plaintiffs assert that Justin's advisor, David Lerach, told Plaintiffs at Justin's funeral that he was aware Justin had mental health issues "consistent with anxiety and depression." *Id.*, ¶¶ 64-69. But Plaintiffs do not allege how or when Lerach became aware of Justin's mental health issues; nor do they allege that Lerach, or any other professor, shared this information with someone at UNC with authority to intervene. Ultimately, Plaintiffs fail to show how UNC, as an entity, would have been aware of Justin's issues in class, let alone how such common undergraduate behaviors as skipping or failing classes would put UNC on notice that Justin had a disability or needed accommodation. Further, awareness of "issues consistent with anxiety and depression" is not the same as knowledge of a diagnosis, disability, or need for accommodation. *See e.g., Hans v. Bd. of Shawnee Cty. Comm'rs*, 775 F. App'x 953, 961 (10th Cir. 2019) (need for accommodation could be obvious where deputies knew plaintiff was deaf and video evidence demonstrated they had considerable difficulty understanding her); *West-Helmle v. Univ. of Denver*, 2024 WL 3759397, at *4 (D. Colo. Aug. 12, 2024) (student's email to professor stating he had ADHD did not amount to request for accommodation); *Cunningham v. Wichita State Univ.*, 613 F. App'x. 758,

[7] Plaintiffs allege they informed Brown, Randolph, and Trammell of Justin's mental health issues on May 3, 2024, as they attempted to enter Justin's room the day of his death. *Id.*, ¶¶ 105-06. Even accepting this allegation as true, it does not advance Plaintiffs' failure to accommodate claim because UNC could do nothing at that point to accommodate Justin's alleged disabilities – i.e., implement frequent check-ins.

759–60 (10th Cir. 2015) (affirming 12(b)(6) dismissal of failure-to-accommodate claim where university could not accommodate disability it did not know about and student's disclosure of ADD did not suggest obvious need for accommodation); *Kaltenberg v. Ohio College of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998) (telling academic counselor about ADD did not impose obligation to offer accommodations).

Finally, Plaintiffs allege UNC has a referral system for students, professors, or staff who have concerns about a student's wellbeing. ECF 34, ¶¶ 302-05. UNC does have such a referral system; and it is intended to "assemble and integrate information [from multiple sources] about a struggling student, and then reach out to the student to offer support." *Id.* at ¶ 304, n.3. But such a system is only as good as the information it receives, and here, no one—not Justin, his fellow students, his professors, or his parents—reported their concerns about Justin's withdrawal, academic decline, or mental health. Just because the referral system exists does not mean UNC is made aware of a student in need.[8]

Plaintiffs repeatedly assert that UNC "regarded" Justin as having a disability, but this allegation is not borne out in the FAC. *Compare id.* at ¶¶ 268, 320, 322, *with id.* at ¶¶ 278-79, 290, 311, 331-32, 353, 359-60, 370 (asserting UNC "should have known" Justin had a disability requiring accommodation). The assertion is conclusory and

---

[8] Due to Ms. Altman's call for a wellness check on February 2, 2024, a "Student of Concern" report was opened for Justin. *Id.* at ¶ 46, 267, 319. Having discovered Justin in his room, apparently sleeping, and without further information from Ms. Altman about Justin's potential mental health issues, the Student of Concern report was closed without further action. *Id.*, ¶ 47.

speculative. Indeed, as demonstrated above, UNC was not aware of Justin's purported disability, nor were Justin's alleged disabilities so "open, obvious, and apparent" that UNC could have been aware without being informed of them. Because the FAC fails to demonstrate UNC's knowledge, as an entity, of Justin's disability or need for accommodation, Plaintiffs have not stated a plausible failure to accommodate claim. For this reason alone, their disability discrimination claims should be dismissed.

### B. Plaintiffs do not plausibly allege their proposed accommodation was reasonable.

Plaintiffs allege Justin required an accommodation of "Defendant UNC and [his] parents conducting frequent check-ins on [his] well-being." ECF 34, ¶¶ 281, 334, 362; *see also id.*, ¶¶ 53, 68, 158. Not only was the need for such accommodation not obvious, but Plaintiffs fail to plausibly allege the accommodation was reasonable. *See Norwood,* 57 F.4th at 786.

The need for "frequent check-ins" was not obvious. Justin never requested them, and the FAC fails to allege that check-ins were something Justin wanted or believed he needed. The FAC lacks any allegations demonstrating whether or how frequent check-ins from UNC, even if reasonable, would have made a difference with respect to Justin's academic performance or mental health. Nor are "frequent check-ins" the same as the "service" Plaintiffs allege was an "integral component" of UNC's housing services—that is, "[e]mergency welfare checks and emergency access" to dorm rooms. ECF 34, ¶ 23.

Plaintiffs also do not show that such accommodation was reasonable. They offer no specifics about how often or under what circumstances UNC or Justin's parents

would have checked in. Requiring a staff member from UNC to conduct a wellness check on Justin, an adult, whenever his parents contacted them because Justin was not answering his phone or they suspected he was skipping class is patently unreasonable. Equally unreasonable would have been allowing Justin's parents access to his room whenever they desired, which would presumably involve allowing them entry into a locked and private dormitory building, meant for student-residents and UNC staff only. With hundreds of students living in Justin's residence hall, and elsewhere on campus, it is unreasonable to expect residential staff to have the capacity or qualifications to make frequent visits to his room and engage him in discussions about his mental health.

### C. Plaintiffs do not plausibly allege that Justin was denied the benefits of UNC's program or activity because of his disability.

To prevail on their disability discrimination claims, Plaintiffs must show that UNC's denial of accommodation prevented Justin from accessing the benefits of UNC's program, service, or activity. *See Robertson*, 500 F.3d at 1193. Throughout the FAC, Plaintiffs allege in a conclusory fashion that UNC denied Justin access to its programs, services, or activities. *See* ECF 34, ¶¶ 259, 301, 322, 330, 352. Such allegations cannot survive a motion to dismiss. *See Ashcroft*, 556 U.S. at 663 ("Threadbare recitals of the elements … supported by mere conclusory statements, do not suffice."). The FAC fails to explain the program, service, or activity that UNC denied Justin access to.

Plaintiffs allege that campus housing constitutes a service, program, or activity of UNC and further allege, without support, that "[e]mergency welfare checks and emergency access to dormitory rooms are integral components" of UNC's housing

program. ECF 34, ¶¶ 22-24. But the staff of Justin's residence hall *did* conduct a wellness check at Ms. Altman's insistence on February 1, 2024, and they were in the process of conducting another wellness check at the Plaintiffs' insistence on May 3, 2024, when they discovered Justin's body. *Id.*, ¶¶ 38-45; 99-127. Even if Plaintiffs are correct that emergency welfare checks and access to student dorm rooms constitute dormitory services, Plaintiffs have not shown that UNC failed to provide those services or that they would have helped Justin access UNC's programs and services.

Plaintiffs also assert that UNC's refusal to allow them access to Justin's room was a denial of Justin's access to UNC's services. *See id.*, ¶¶ 49, 55-58, 270-76, 280-85, 324. Setting aside the Fourth Amendment implications of allowing access to student rooms without permission, denying the Altmans access to Justin's room did not violate *Justin's* right to access UNC's services. Since Plaintiffs' disability discrimination claims are on behalf of Justin's estate, at issue is denial of access to Justin, not his parents.

Further, Plaintiffs assert that Justin was "denied meaningful access to [UNC's] emergency response and crisis-intervention services…." *Id.* at ¶ 260. But as described above, UNC's crisis-intervention process depended on information submitted to the Dean of Students Office regarding a particular student. *Id.* at ¶ 304, n.3. Justin was not denied access to UNC's crisis-intervention services; the crisis-intervention process was not initiated because no concerns were reported about Justin to UNC's administration.

The FAC does not plausibly allege that Justin's disability and need for accommodation were obvious. The FAC also fails to plausibly allege that Plaintiff's proposed accommodation of "frequent check-ins" was reasonable or that Justin was

denied the benefits of any UNC service. Consequently, the Court should dismiss Plaintiffs' disability discrimination claims.

**II. The Eleventh Amendment bars Plaintiffs' CADA claim.**

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amend. XI. "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). "[S]tate agencies partake in the State's immunity if they are 'arms of the state.'" *Wood v. Milyard*, 414 F. App'x 103, 105 (10th Cir. 2011). UNC is an arm of the State. *Graham v. State,* 956 P.2d 556, 562–65 (Colo. 1998).

Unless a state has waived its Eleventh Amendment immunity, such absolute immunity applies regardless of the relief sought. *Higganbotham v. Okla. Transp. Comm'n,* 328 F.3d 638, 644 (10th Cir. 2003). A waiver of sovereign immunity "must be express and unequivocal." *V-1 Oil Co. v. Utah Dep't of Pub. Safety*, 131 F.3d 1415, 1421 (10th Cir. 2002). "When a statute or other document purportedly waives a state's Eleventh Amendment immunity," a court "'will give effect to [the waiver] only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction.'" *Pettigrew v. Okla. ex rel. Okla. Dep't of Pub. Safety*, 722 F.3d 1209, 1213–14 (10th Cir. 2013) (quoting *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990)).

Here, the Eleventh Amendment bars Plaintiffs' claims under CADA because the State has not consented to suit. For a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, such provision must expressly specify a state's intention to subject itself to suit in *federal* court. *Feeney*, 495 U.S. at 306. CADA contains no such provision. Colo. Rev. Stat. § 24-34-802(2)(a) (stating only that aggrieved party "may bring a civil suit in a court of competent jurisdiction"); *see Feeney*, 385 U.S. at 306 ("[T]he Court requires that consent to suit in federal court be express and thus has construed ambiguous and general consent to suit provisions, standing alone, as insufficient to waive Eleventh Amendment immunity.")

As numerous courts in this district have found, the Colorado General Assembly did not waive the State's Eleventh Amendment immunity by promulgating CADA. *See e.g., Slover v. Univ. of Colo.*, No. 21-cv-01378-SKC, 2022 WL 833364, at *2 (D. Colo. Mar. 20, 2022); *Ulrich v. Dep't of Hum. Servs.*, No. 20-cv-03810-WJM-KMT, 2022 WL 223212, at *3 (D. Colo. Jan. 25, 2022), *report and recommendation adopted* (Feb. 9, 2022); *Harp v. Dep't of Hum. Servs.*, No. 11-cv-01972-PAB-CBS, 2012 WL 1885108, at *2 (D. Colo. Mar. 9, 2012) ("The Eleventh Amendment also prohibits suits against the state in federal court under the Colorado Anti-Discrimination Act"), *report and recommendation adopted*, 2012 WL 1884736 (D. Colo. May 23, 2012). If this Court chose to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's CADA claims, that "does not override the Eleventh Amendment's bar on suing a state in federal court." *Pettigrew*, 722 F.3d at 1213. Accordingly, because CADA does not waive the State's sovereign immunity, this Court should dismiss Plaintiff's CADA claim.

## III. Plaintiffs' state-law claims should be dismissed under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[9]

This Court should dismiss Claims I through III for lack of subject matter jurisdiction under the CGIA because these claims lie in tort or could lie in tort, do not fall into a waived area of governmental immunity, and are not supported by specific facts plausibly showing willful and wanton conduct. Alternatively, this Court should dismiss these claims under Fed. R. Civ. P. 12(b)(6) because Defendants Brown, Randolph, and Trammell did not owe Justin a duty of care under the circumstances of this case.

### A. The CGIA bars Plaintiffs' claims.

The CGIA recognizes the State's sovereign immunity and waives that immunity in limited circumstances. It covers all actions against public entities and employees which lie or could lie in tort. Colo. Rev. Stat. § 24-10-106(1). Thus, a State Defendant is immune from any tort claims unless such claims arise under one of the limited areas for

[9] The FAC confuses Colorado law in multiple respects. First, Plaintiffs seem to bring a standalone claim under Colorado's survival statute, Colo. Rev. Stat. § 13-21-101. *See* ECF 34, ¶¶ 236-40. But section 13-21-101 does not create a separate cause of action. Instead, it provides that certain "causes of action" that existed at the time of a person's death "shall survive and may be brought or continued notwithstanding the death of the person in favor of or against whom such action has accrued. . . ." The cause of action that survives Justin's death is negligence. Second, Plaintiffs' claim for "willful and wanton negligence" is also not a separate claim. Colorado law does not recognize a standalone claim for willful and wanton conduct. *Carothers v. Archuleta Cnty. Sheriff's Office,* 159 P.3d 647, 656 (Colo. App. 2006). Claims for "willful and wanton" conduct must be linked to a recognized tort theory of recovery. *Id.* Third, a survival action must be brought by the personal representative of the deceased's estate. § 13-20-101(2); *Espinoza v. O'Dell*, 633 P.2d 455, 466 (Colo. 1981) ("The personal representative of the decedent's estate, by necessity, stands in the decedent's shoes in a state survival action."). Here, Plaintiffs bring Claims II and III through Mr. and Mrs. Altman, rather than Mr. Altman in his capacity as personal representative.

which sovereign immunity has been waived, *id.*, or unless the act or omission causing injury was willful and wanton, Colo. Rev. Stat. § 24-10-118(1). *See Hernandez v. City & Cnty. of Denver*, 439 P.3d 57, 59–60 (Colo. App. 2018). Federal courts apply the CGIA's immunity provisions "when exercising supplemental jurisdiction over a Colorado tort claim asserted against a public employee." *Estate of Ceballos*, 919 F.3d at 1222; *see, e.g., Butts v. Colorado*, No. 25-cv-990-NYW-SBP, 2026 WL 878771, at *6-8 (D. Colo. Mar. 31, 2026) (dismissing claims for negligent misrepresentation, negligence, and violation of Colorado Consumer Protection Act under CGIA).

**1. Plaintiff's state-law claims are subject to the CGIA.**

The FAC concedes that the CGIA governs Plaintiffs' state-law claims. *See* ECF 34, ¶¶ 209-15 (alleging CGIA "maps onto" wrongful death claim and that Plaintiffs' claims meet CGIA's willful and wanton exception), 237 (alleging compliance with CGIA notice provisions), 242 (same).

To be clear, the CGIA applies. Defendants Brown, Randolph, and Trammell are public employees under the CGIA. *Id.* ¶¶ 11, 16-18 (alleging Defendants are employed by UNC, a public university); *see also* Colo. Rev. Stat. § 24-10-103(4)(a). And Plaintiffs' claims against them lie in tort or could lie in tort because Plaintiffs seek redress for an alleged breach of a duty of care. ECF 34, ¶ 229 ("All Defendants breached their duty of care."); *see Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1003 (Colo. 2008) ("When the injury arises either out of conduct that is tortious in nature or out of the breach of a duty recognized in tort law, and when the relief seeks to compensate the plaintiff for that injury, the claim likely lies in tort or could lie in tort for purposes of the

CGIA."); *L.J. v. Carricato*, 413 P.3d 1280, 1286 (Colo. App. 2018) (CGIA governed claims for wrongful death and negligence based on alleged breach of duty of care).

Lastly, the tortious conduct alleged in the FAC does not fall within any of the enumerated areas for which the State has waived immunity under the CGIA. *See* § 24-10-106(1). Thus, Defendants are immune from liability under the CGIA unless this Court determines that Plaintiffs sufficiently show willful and wanton conduct. *See Hernandez*, 439 P.3d at 59–60. For the reasons below, Plaintiffs fail to make this showing.

**2. Plaintiffs failed to plausibly allege that Defendants Brown, Randolph, and Trammell acted willfully and wantonly.**

To state a claim based on willful and wanton conduct against a public employee, Plaintiffs must state the "specific factual basis of such allegations." § 24-10-110(5)(a). They cannot simply allege the conduct was "willful and wanton," but rather must "set forth specific facts to support a reasonable inference that [Defendants] recklessly disregarded the consequences of [their] actions." *Wilson v. Meyer*, 126 P.3d 276, 282 (Colo. App. 2005). "Thus, a plaintiff must plead specific facts to show or raise an inference that the defendant's conduct was 'specifically calculated to cause the alleged harm' or that defendant was 'aware [his or] her conduct would cause the alleged harm.'" *McDonald v. Wise*, 769 F.3d 1202, 1218 (10th Cir. 2018) (quoting *Wilson*, 126 P.3d at 282). "Whether a plaintiff has pled sufficient facts in the complaint to support such an inference is a determination made by the court." *Id.*; *see also L.J.*, 413 P.3d at 1288.

Here, the FAC fails to plausibly allege that Defendants engaged in willful and wanton conduct such that the CGIA waives their immunity. First, as detailed in the next

section, because Defendants Brown, Randolph, and Trammell did not owe Plaintiffs a duty of care, Plaintiffs' claims for wrongful death and negligence fail. Under Colorado law, "even if the conduct at issue can be characterized as willful and wanton, so as to avoid application of the CGIA, the plaintiff must nevertheless allege a cognizable claim for relief, and must prove the elements of that claim at trial, in order to be entitled to recovery." *Carothers*, 159 P.3d at 656. Thus, in the absence of a duty of care, Defendants Brown, Randolph, and Trammell cannot be held liable for negligence or wrongful death, regardless of how their conduct is characterized. *See id*.

Second, the actual allegations surrounding Defendants Brown, Randolph, and Trammell's alleged actions do not reflect willful and wanton conduct. Even taking Plaintiffs' allegations as true, the FAC merely alleges the following non-conclusory facts:

- **Defendant Brown**. Ms. Brown did not immediately open the door to Justin's dorm room on May 3, 2024, at Ms. Altman's insistence. ECF 34, ¶¶ 97, 163. Eventually, Ms. Brown contacted campus police and was present when Officer Trammell arrived. *Id.*, ¶¶ 103, 106. Ms. Brown appeared to have some knowledge about the Student of Concern report, and that Justin had avoided his Residential Advisor. *Id.*, ¶¶ 142-43.

- **Defendant Randolph**. Ms. Randolph met Ms. Altman on May 3, 2024, sometime after 4:45 p.m., and instead of authorizing a welfare check right away, called dining services to see when Justin last used his swipe card. *Id.*, ¶¶ 98-101. She was present when Ms. Altman informed Officer Trammell of Justin's threats to take his own life and mental health issues, and "eventually" opened the door to Justin's room. *Id.*, ¶¶ 106-08. She closed the door to Justin's room and then opened it again after being directed to do so by Officer Trammell. *Id.*, ¶¶ 114-15. She then contacted her supervisor, who told her housing staff could not enter Justin's room. *Id.*, ¶¶ 118-19. Then, after Officer Trammell contacted his supervisor and obtained approval to enter the room, Ms. Randolph observed that the bathroom door was locked and that it could only be locked from the inside. *Id.*, ¶ 126.

- **Officer Trammell**. Officer Trammell arrived at Justin's residence hall at about

> 4:54 p.m. on May 3, 2024, after Ms. Brown contacted campus police. *Id.*, ¶¶ 103-04. Ms. Altman told Officer Trammell about Justin's depressive episode, suicidal ideation, and failure to communicate with his parents. *Id.*, ¶ 105. Officer Trammell refused to open the door to Justin's room. *Id.*, ¶ 107. Then, when Ms. Brown opened the door to the room, Officer Trammell observed that the room was dark and called out Justin's name several times but refused to let anyone enter. *Id.*, ¶ 109. He then tried calling Justin's name again and attempted to close the door multiple times, stating that exigent circumstances did not warrant entering the room without a warrant. *Id.*, ¶¶ 112-16. Eventually, Officer Trammell obtained approval from his supervisor to enter the room and, after attempting to leave again, unlocked the bathroom door where Justin was found at 5:25 p.m., about 30 minutes after Officer Trammell had arrived. *Id.*, ¶¶ 122-28. Officer Trammell stayed on the scene, called emergency medical services, and attempted life-saving measures on Justin. *Id.*, ¶¶ 130-33.

This course of events, which took place about 30 to 45 minutes before Justin's body was discovered, does not demonstrate that any of these Defendants' conduct was "specifically calculated to cause the alleged harm" or that these Defendants were "aware [their] conduct would cause the alleged harm." *McDonald*, 769 F.3d at 1218. As the Tenth Circuit explained in *Quintana v. Dodge*, No. 23-1113, 2024 WL 1048959, at *5 (10th Cir. Mar. 11, 2024) (unpublished), the mere possibility that a defendant knew harm *could* result to a plaintiff does not meet the high threshold to state willful and wanton conduct, which requires a showing that a defendant knew harm *would* result. Courts in this circuit have held that that a government defendant's conduct under far more severe circumstances did not rise to the level of willful and wanton conduct. *See, e.g., id.* (police officers' awareness that shooting fourth tear gas cannister into occupied home *could* cause fire insufficient to state claim for willful and wanton conduct because officers did not know fire *would* occur); *Schnurr v. Bd. of Cnty. Comm'rs*, 189 F. Supp. 2d 1105, 1140 (D. Colo. 2001) (neither law enforcement's decision to tell students

trapped in library during Columbine massacre to stay put, nor decision to "secure the perimeter" and refrain from entering school, constituted willful and wanton conduct).

In short, even if Defendants Brown, Randolph, and Trammell knew about Justin's mental health problems on May 3, 2024, the FAC does not plausibly allege that they knew harm *would* result from delays in obtaining authority to enter Justin's room. *See also Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1148 (D. Colo. 2001) ("There is no statutory or case precedent charging law enforcement officers with the duty of predicting violent acts."). Thus, Defendants Brown, Randolph, and Trammell are immune under the CGIA, and the Court should dismiss Plaintiffs' state-law claims.

**3. There is no evidentiary dispute relevant to governmental immunity; however, if this Court finds such a dispute exists, then a *Trinity* hearing must be held to determine that the factual allegations in the FAC raise a triable issue of fact.**

This Court should decide the issue of subject matter jurisdiction on the pleadings alone, without a hearing, because Plaintiff has failed to allege sufficient facts to show jurisdiction, and there is no evidentiary dispute relevant to governmental immunity. *See Finnie*, 79 P.3d at 1260. However, if this Court determines that the issue of immunity cannot be resolved on the pleadings, the Court should hold a *Trinity* hearing to resolve any disputed issues of immunity. *Id.* at 1258 ("[T]rial courts may conduct *Trinity* hearings to determine the facts necessary to definitively resolve all disputed issues of immunity, including those deemed non-jurisdictional."). A Tenth Circuit panel recently reaffirmed that a *Trinity* hearing is the proper mechanism to resolve factual disputes related to the issue of sovereign immunity under the CGIA. *Guardado v. City & Cnty. of Denver*, No.

24-1415, 2025 WL 1703531, at *4 (Jun. 18, 2025) (unpublished). Accordingly, this Court should hold a *Trinity* hearing if it does not dismiss Plaintiffs' state-law tort claims.

**B. Plaintiffs fail to state plausible claims for relief because these Defendants did not owe Justin a duty of care.**

Plaintiffs' state-law clams depend on the alleged existence of a duty of care owed to Justin by Defendants Brown, Randolph, and Trammell. ECF 34, ¶ 229. The State Defendants owed no such duty, and thus these claims fail as a matter of law.

A claim for negligence must demonstrate the existence of a legal duty. *City of Westminster v. Centric-Jones Constr.*, 100 P.3d 472, 485 (Colo. App. 2003). Similarly, "[t]o recover on a wrongful death claim founded on negligence, a plaintiff must show, among other things, that the defendant owed the decedent a duty of care." *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 983 (Colo. App. 2011). Thus, claims for negligence and wrongful death "must fail if based on circumstances for which the law imposes no duty of care upon the defendant for the benefit of the plaintiff" or the decedent. *See Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 24 (quoting *Univ. of Denver v. Whitlock*, 744 P.2d 54, 56 (Colo. 1987)).

"In deciding whether a duty exists," Colorado courts "have traditionally examined (1) the nature of the relationship between the parties and (2) a particular set of public policy factors. Either or both may confer a duty or inform the scope of the duty." *Id.* These public policy factors include "(1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden guarding against injury or harm, and (4) the consequences of

placing the burden upon the actor." *HealthONE v. Rodriguez ex rel. Rodriguez*, 50 P.3d 879, 888 (Colo. 2002). Here, Defendants Brown, Randolph, and Trammell did not owe Plaintiffs the duties that the FAC seeks to impose on them.

### 1. Colorado does not impose a duty of care in nonfeasance cases such as this one.

"[T]he law has long recognized a distinction between action and a failure to act—that is to say, between active misconduct working positive injury to others [misfeasance] and passive inaction or a failure to take steps to protect them from harm [nonfeasance]." *Whitlock*, 744 P.2d at 57 (quotation marks omitted). "Allegations as to what a defendant did not do are indisputably allegations of nonfeasance." *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287, 295 (Colo. 2020).

"The fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Whitlock*, 744 P.2d at 58 (quoting Restatement (Second) of Torts § 314 (1965)). Thus, "[f]or claims involving nonfeasance, a duty to act exists only when there is a special relationship between the parties 'of such a character that social policy justifies the imposition' of such a duty." *Harrington v. Neutron Holdings, Inc.*, 564 P.3d 309, 313 (Colo. App. 2024) (quoting *Wagner*, 467 P.3d at 295). Under Colorado law, only six such special relationships exist: (1) common carrier/passenger; (2) innkeeper/guest; (3) possessor of land/invited entrant; (4) employer/employee; (5) parent/child; and (6) hospital/patient. *Id.*

The Colorado Supreme Court expressly decided, nearly forty years ago, that the

university-student relationship "provides no basis for the recognition of a duty of the [u]niversity to take measures for protection of" a student "against the injury that he suffered." *Whitlock*, 744 P.2d at 61. *Whitlock* recognized that "[i]n today's society, the college student is considered an adult capable of protecting his or her own interests; students today demand and receive increased autonomy and decreased regulation on and off campus." *Id.* at 60. To impose a duty on a university to safeguard adult students from their own decisions would "effectively tak[e] away much of the responsibility recently recognized in students for making their own decisions with respect to . . . personal safety," and "would 'produce a repressive and inhospitable environment, largely inconsistent with the objectives of a modern college education.'" *Id.* (quoting *Beach v. University of Utah,* 726 P.2d 413, 419 (Utah 1986)).

Here, because Plaintiffs allege nonfeasance by Defendants Brown, Randolph, and Trammell, Colorado law does not recognize the existence of a duty of care owed to Plaintiffs. The FAC is replete with allegations of what Defendants should have done to protect Justin from himself. *E.g.,* ECF 34, ¶¶ 150 ("Despite obtaining this knowledge [that Justin's grades declined during the Fall 2023 semester], UNC did not inform Justin's parents, nor did it provide support to Justin."), 160 ("UNC failed to provide this reasonable accommodation [various service and welfare checks] and failed to otherwise take any action to support Justin."), 177 ("Had Defendants afforded Justin meaningful access to the University's crisis intervention and emergency-response services through reasonable accommodations, Justin would have received emergency assistance while still alive."), 201 ("By May 3, 2024, Defendants had accumulated months of information

demonstrating Justin's deteriorating mental condition and had received direct warnings from his parents that he faced an imminent risk of death. Nevertheless, Defendants consciously disregarded that known and substantial risk by delaying entry, failing to promptly conduct a complete welfare search, and failing to provide timely emergency assistance."). But because the university-student relationship did not require UNC to proactively take any measures to protect Justin from harming himself, Defendants Brown, Randolph, and Trammell did not owe Plaintiffs a duty of care. *Whitlock*, 744 P.2d at 61. Accordingly, these Defendants cannot be held liable for negligence or wrongful death, and this Court should dismiss Plaintiffs' state-law claims.

**2. Plaintiffs cannot otherwise show that these Defendants owed them a duty of care.**

The gist of Plaintiffs' state-law claims is that Defendants Brown, Randolph, and Trammell should have anticipated Justin's needs without him ever having expressed those needs and without any evidence they knew Justin was an imminent suicide risk. But even if this Court views this case as one of misfeasance, Colorado law does not recognize a duty of care under these facts. *See HealthONE*, 50 P.3d at 888.

Justin's suicide was undoubtedly tragic. But, in analyzing the traditional duty factors, the Colorado Court of Appeals concluded that no duty to prevent suicide existed in the absence of a special relationship between the parties. *See English v. Griffith,* 99 P.3d 90, 94 (Colo. App. 2004) ("[a]n individual, such as defendant, cannot reasonably be expected to anticipate the mental health consequences that may flow from otherwise ordinary conduct . . . that allegedly occurred here. The scope of

potentially injurious conduct would be too broad."). Other jurisdictions similarly recognize that an individual cannot be expected to anticipate the mental health consequences of his or her own conduct. *See Johnstone v. City of Albuquerque,* 145 P.3d 76, 81 (N.M. Ct. App. 2006) ("[L]aypeople cannot be reasonably expected to anticipate the mental health consequences of their acts or omissions." (quoting *Chalhoub v. Dixon,* 788 N.E.2d 164, 167 (Ill. Ct. App. 2003))); *McPeake v. William T. Cannon, Esquire, P.C.,* 553 A.2d 439, 443 (Pa. Super. Ct. 1989) ("[A]n attorney does not possess the ability either to perceive that a client is likely to commit suicide, or to prevent the suicide.").

Further, the magnitude of the burden Plaintiffs seek to impose here, and the consequences of imposing this duty on these Defendants—none of whom are mental health professionals—would be astronomical. Plaintiffs' theory would require university administrators to once again stand *in loco parentis* to their adult students. *See Whitlock*, 744 P.2d at 59–60. The constant monitoring of university students that would be necessary under Plaintiffs' theory would "'produce a repressive and inhospitable environment, largely inconsistent with the objectives of a modern college education.'" *Id.* at 60 (quoting *Beach,* 726 P.2d at 419). Recognizing this duty would require adopting a logic that the Colorado Supreme Court considered and rejected. *See id.*

For these reasons, Defendants did not owe Plaintiffs a duty of care, and Plaintiffs' state-law claims should be dismissed.

## CONCLUSION

The Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

Respectfully submitted this 1st day of September 2026.

PHILIP J. WEISER
Attorney General

*/s/ Dmitry B. Vilner*
DMITRY B. VILNER, *
Senior Assistant Attorney General
Tort Litigation
Civil Litigation and Employment Law

R. WARREN BECK, *
Assistant Attorney General
Higher Education
State Services

*Attorneys for Defendants*

Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6645; 6614
E-Mail: Dmitry.Vilner@coag.gov
Warren.Beck@coag.gov
*Counsel of Record

MATTER ID: 2025-HENO-159304